| | | |
|---|---|---|
| **RONALD F. VERLEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:12-CV-45** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Reverend Ronald Verlee appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner"), denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"). (Docket # 1.)  Under 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72-1, District Judge Theresa Springmann referred this case to the undersigned Magistrate Judge for the issuance of a Report and Recommendation. (Docket # 4.)

Having reviewed the record, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.  This Report and Recommendation is based on the following facts and principles of law.

## I.  PROCEDURAL HISTORY

Verlee applied for DIB on February 17, 2009, alleging that he became disabled on December 24, 2006, after a bout of viral encephalitis. (Tr. 19, 41, 163-64.)  The Commissioner denied his application initially and upon reconsideration, and Verlee requested an administrative hearing. (Tr. 54-55, 59-72.)  On May 10, 2011, a hearing was conducted by Administrative Law

Judge ("ALJ") Steven Neary, at which Verlee, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 36-53.) On June 20, 2011, the ALJ rendered an unfavorable decision to Verlee, concluding that he was not disabled because he could perform his past relevant work as a minister as it is typically performed in the national economy. (Tr. 19-30.) The Appeals Council denied Verlee's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

Verlee filed a complaint with this Court on February 13, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Verlee argues that the ALJ erred by: (1) relying on the VE's testimony, which was based on the Dictionary of Occupational Titles ("DOT"), at step four of his analysis; (2) failing to adopt *all* aspects of the opinion of Heidi Graves, Ph.D., an examining psychologist, to which he assigned great weight; and (3) failing to adequately account for Verlee's left upper extremity limitations in the residual functional capacity ("RFC") assessment. (Pl.'s Br. 9-24.)

## II. FACTUAL BACKGROUND[1]

### A. Background

At the time of the ALJ's decision, Verlee was sixty-two years old and had college and doctoral degrees. (Tr. 30, 38-39, 48.) He last worked as a full-time senior pastor at a large United Methodist church (1,200 members) in December 2006 and had served various churches for almost forty years. (Tr. 39, 48, 220.) He was awarded disability benefits from the United Methodist Board of Pension beginning in 2007. (Tr. 39.)

At the hearing, Verlee testified that he lives with his wife and performs his self care

---

[1] In the interest of brevity, this Opinion recounts only the portions of the 600-page administrative record necessary to the decision.

independently, as well as much of the housework. (Tr. 39, 47.)  On good days, he exercises, drives a car, and attempts to read and study. (Tr. 47-48.)  He volunteers as a pastoral consultant at various United Methodist churches ten to twelve hours per week, filling in when their clergy are on vacation. (Tr. 40, 47.)

As to his symptoms, Verlee stated that his memory and concentration are "greatly compromised." (Tr. 41.)  More specifically, he reported that about every six weeks, he has one day where he experiences between ten and twelve two-to-three minute periods of "absolute confusion"; then, the following day he is "totally exhausted." (Tr. 41-43, 50.)  From a physical perspective, Verlee complained of left-sided weakness that makes it "impossible" to even type with his left hand, and, as a result, he primarily uses his right hand for tasks (Tr. 42-44); he did not note any other physical problems (Tr. 46).  Verlee takes various medications for his symptoms, but reported no side effects from them. (Tr. 45-46.)

*B. Summary of the Relevant Medical Evidence*

On December 7, 2005, Verlee was hospitalized with acute confusion; a brain MRI and CT scan suggested herpes simplex virus type I encephalitis. (Tr. 282-94.)  He showed rapid improvement in mentation, and five days later was sent home with outpatient intravenous therapy. (Tr. 293-95.)

On January 6, 2006, Dr. James Dozier, a neurosurgeon, reported that Verlee had a normal neurological exam and was "markedly improved" with "minimal symptoms." (Tr. 350.)  Six months later, in July, Dr. Robert Nelson indicated that Verlee "was clinically doing reasonably well" and, although he did not prescribe any therapeutic interventions, recommended that Verlee undergo an immunological evaluation in a few months. (Tr. 358.)  On November 7, 2006, Dr.

Bernard Stevens, an endocrinologist, told the United Methodist Church's disability insurance provider that Verlee could resume his duties as a minister because, aside from some complaints of fatigue, he no longer had confusion or other cognitive deficits. (Tr. 389.)

Several days later, Dr. John Smith, Verlee's primary care physician, penned a letter indicating that he disagreed with Dr. Stevens's opinion. (Tr. 387.) He opined that Verlee's main problem was cognitive dysfunction and that although he had improved with antidepressant and anti-anxiety medications, he did not think that Verlee could competently function as a senior minister of a large church. (Tr. 387.) Dr. Smith wrote that he was incapable of answering whether Verlee could work in some reduced capacity and, for this reason, he had referred Verlee to a therapist. (Tr. 387.)

The following day, Mary Reiter, a psychologist, reported that Verlee was ready to "move forward" after attending four counseling sessions. (Tr. 386.) She indicated that his depression and anxiety had lifted, but that a referral to a neuropsychologist may be in order to assess his cognitive skills due to his reported inability to read for any length of time, reduced concentration, and memory loss. (Tr. 386.) She commented that these purported changes in his intellectual functioning had not been apparent in their therapy sessions. (Tr. 386.)

On January 4, 2007, Dr. Robert Nelson wrote that Verlee had a normal examination and "ha[d] been doing reasonably well." (Tr. 469.) Verlee reported that he had intermittent anxiety, but that he had not needed to take any Xanax in the past two months; he continued, however, to take an antidepressant. (Tr. 469.) Dr. Nelson scheduled Verlee to return in one year. (Tr. 470.)

That same month, Heidi Musgrave, Ph.D., a neuropsychologist, evaluated Verlee and administered a series of memory tests. (Tr. 364-81.) She noted that he was cooperative, but had

significant difficulty on tests that measured effort. (Tr. 378.)  He did much worse on the tests that Dr. Musgrave administered in the afternoon, which she found inconsistent with his complaints that he fatigued easily, became confused, and had difficulty concentrating and reading. (Tr. 378-79.)  In fact, Verlee took less than a thirty-minute break during the nine hours of testing and did not complain of fatigue. (Tr. 378-79.)  Dr. Musgrave did note that Verlee urinated frequently and that he reported two bowel accidents in the last two months. (Tr. 369.)

Dr. Musgrave remarked that on "visual memory measures," Verlee was "quite impaired," but at the same time concluded that "[t]here was no difference between his IQ scores and his memory scores indicating no significant memory problems." (Tr. 378.)  She noted that "there [wa]s some evidence of visual/spatial construction/memory impairment," but could not determine the cause of these difficulties. (Tr. 379.)  She further stated that she could not ascertain the level of Verlee's impairment "[d]ue to some effort problems." (Tr. 379.)  She reported that "at no time did [Verlee] complain of visual spatial difficulties" and that he had "stated that he ha[d] always had difficulties in this area." (Tr. 379.)  Personality testing suggested that Verlee was "somewhat defensive, moralistic, and rigid" and tended to "somaticize his psychological problems in stress." (Tr. 379.)  Dr. Musgrave also completed a check-the-box mental RFC assessment form, in which she indicated that Verlee had "no evidence of limitation" in nineteen mental activity categories and a "marked" limitation in one category—his ability to respond appropriately to changes in the work setting. (Tr. 380-81.)  She further noted that "anxiety may cause urinary frequency and bowel difficulties at times." (Tr. 381.).

In February and March 2007, Verlee saw Dr. Karen Roos, a neurologist, complaining of continued occasional short episodes of flu-like symptoms with confusion and disorientation. (Tr.

466-68.)  Dr. Roos observed that Verlee had normal comprehension, fluency, and language, but some subtle problems with short-term memory. (Tr. 466-68.)  He had a normal neurological exam and could follow all instructions, including those for complicated tasks. (Tr. 466-68.)  Dr. Roos suspected that Verlee's episodes could be partial or complex seizures and prescribed Depakote. (Tr. 466-68.)

More than a year later, in May 2008, Dr. Roos documented that Verlee's brain MRI showed "very stable findings" compared to an MRI a year earlier. (Tr. 435-36, 459-60, 465-66.)  In October 2008, Verlee reported to Dr. Roos that he had six or seven one-minute episodes of confusion and disorientation since his May appointment; he had resumed preaching part-time. (Tr. 434.)  He complained of some left-sided weakness and tremors that were only bothersome when he was extremely fatigued; he told her that he could compensate for these symptoms because he was right-handed. (Tr. 434.)  She observed that he had mild weakness and a tremor in his left upper extremity and mild emotional lability, but he had an otherwise normal neurological exam, normal gait, fluent speech, and good comprehension. (Tr. 434.)  She planned to measure Verlee's Depakote level and did not recommend any further medication or tests because his symptoms were not particularly bothersome to him. (Tr. 435.)  A November 2008 brain MRI was grossly unchanged from his previous MRI. (Tr. 513.)

In January 2009, Dr. Nelson wrote that Verlee's symptoms had not progressed, that he occasionally had fatigue, and that "[i]n the interim, he [wa]s still disabled." (Tr. 414.)  Dr. Nelson scheduled him for a return visit in one year. (Tr. 414.)

In March 2009, Verlee returned to Dr. Roos, complaining of worsening left-sided tremors, which were present at rest or with activity and increased with fatigue. (Tr. 458-59.)  He

reported, however, that he had experienced only one seizure episode in the last six months. (Tr. 458.)  He indicated that he was more active and was preaching part-time, commenting that he did quite well when filling in for a colleague for six weeks. (Tr. 458.)  Dr. Roos observed that Verlee had very mild residual weakness and a tremor in his left upper extremity and a mildly wide-based gait. (Tr. 458-59.)  Otherwise, he had a normal neurological exam, normal tandem gait, fluent speech, and good comprehension. (Tr. 459.)  Dr. Roos thought Verlee's tremors were exacerbated by his Depakote, but she did not want to change his dosage since his seizures had been relatively well-controlled; consequently, she prescribed Primidone for the tremors. (Tr. 458-59.)

On May 15, 2009, Dr. J. Sands, a state agency physician, reviewed Verlee's record and opined that he could lift ten pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposures to hazards. (Tr. 482-89.)  Dr. Sands's opinion was later affirmed by a second state agency physician. (Tr. 585.)

Later that month, Verlee told Dr. Roos that he had experienced one day of several short seizures in the last two months. (Tr. 493.)  He complained again of left hand tremors, but said that they were not so disruptive to his daily life that he wanted to discontinue the Depakote, which he found to be very effective in controlling his seizures. (Tr. 493.)  Dr. Roos observed that Verlee had normal cognitive function, memory, and gait; a normal neurological exam; and a mild tremor in his left upper extremity, but not at rest. (Tr. 493.)  She increased his dosage of Primidone and continued his Depakote. (Tr. 493-94.)

On June 8, 2009, Wayne Von Bargen, Ph.D., a state agency psychologist, evaluated Verlee, who reported that as long as he took his medication and worked on his own schedule, he did "pretty well." (Tr. 538-44.)  He elaborated that once every five to six weeks, he had one-to-two minute episodes of confusion every hour. (Tr. 538.)  He stated that he was more relaxed than he had every been in the past and that very little upset him anymore. (Tr. 538.)  Dr. Von Bargen observed that Verlee had logical, relevant, and coherent speech; showed appropriate fine and gross motor skills necessary for completing the evaluation tasks; and readily understood instructions. (Tr. 538-39.)  He documented that "[n]o symptoms of anxiety or depression were revealed" and that Verlee's memory test scores fell within the low average to average range and his sustained concentration and attention within the average range. (Tr. 539.)  Dr. Von Bargen diagnosed Verlee with a cognitive disorder, NOS; assigned him a Global Assessment of Functioning ("GAF") score of 60;[2] and opined that he could care for himself, perform daily activities, and manage his own funds. (Tr. 540.)

The next day, Joelle Larsen, Ph.D., a state agency psychologist, reviewed Verlee's record and concluded that he was mildly limited in his activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. 545-55.)  She concluded that he "appear[ed] to have the cognitive abilities and concentration necessary to complete tasks" and that his psychological difficulties were "not significantly limiting." (Tr. 557.)

In February and July 2010, Verlee saw Dr. Roos for routine follow-up. (Tr. 586-89.)  In

---

[2]  GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).   A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.  And, a GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." Id.

July, Verlee reported that he had experienced only two days of seizure activity in the past five months. (Tr. 586.)  He said that his left hand tremors caused him difficulty in activities requiring fine motor control, such as typing, but that he was able to compensate for them and thus they did not significantly affect his life. (Tr. 586.)  He also relayed that he could perform his activities of daily living, took two forty-five minute walks a day, managed his finances, and had lost fifty pounds through diet and exercise. (Tr. 586.)  Dr. Roos observed that Verlee had intact attention, reasoning, memory, and comprehension; minimal left-sided weakness and a hint of a tremor; and a normal gait and neurological exam. (Tr. 587.)  She documented that his symptoms were stable except for a slight worsening of his tremor, which was possibly exacerbated by the Depakote. (Tr. 587.)  She also noted some tremor in his right upper extremity and thought that he might "have a component of benign essential tremor as well." (Tr. 587.)  She increased his Primidone, maintained his Depakote, and decided against any further psychological testing since his cognitive status seemed stable. (Tr. 587.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### *A. The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On June 20, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 19-30.) He found at step one of the five-step analysis that Verlee had not engaged in substantial gainful activity since his alleged onset date and at step two that he had the following severe impairments: status-post episode of Epstein-Barr virus encephalitis; lymphopenia; left temporal lobe epilepsy; and cognitive disorder. (Tr. 21.) At step three, the ALJ determined that Verlee's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 21-23.)

Before proceeding to step four, the ALJ determined that Verlee's symptom testimony was not reliable to the extent it was inconsistent with the following RFC (Tr. 26):

> [T]he claimant has the residual functional capacity to perform light work . . . except that he is limited to work that does not require climbing and more than occasional balancing, stooping, kneeling, crouching and crawling. He cannot work in unprotected heights or operate hazardous moving machinery. He would be absent at least one day a month. He could not use his non-dominant hand for fine finger manipulation.

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

(Tr. 23.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Verlee was able to perform his past relevant work as a minister as it is typically performed in the national economy. (Tr. 29.) Accordingly, Verlee's claim for DIB was denied. (Tr. 29.)

## C. The ALJ's Step-Four Finding Is Supported by Substantial Evidence

First, Verlee challenges the ALJ's step-four finding that he could perform his past relevant work as a minister as it is typically performed in the national economy, arguing that it is not supported by substantial evidence and also violates the Free Exercise and Establishment Clauses of the First Amendment. Specifically, Verlee claims that the ALJ's reliance on the VE's testimony is misplaced because the DOT does not adequately set forth the job requirements for his past relevant work as a United Methodist Church minister in that it "lumps all of the faith and denominations into a single job description." (Pl.'s Br. 10-14.)

But Verlee's assertion that the ALJ should not have relied upon the VE's testimony is unpersuasive, as the Social Security regulations explicitly state that the ALJ may use the services of a VE or other resources, such as the DOT, when determining whether a claimant can perform his past relevant work. 20 C.F.R. § 404.1560(b)(2). Here, the VE testified that she had reviewed Verlee's record and files relevant to his past employment; prepared a document summarizing his past work history, which specifically reflects that the VE consulted the DOT; and that her testimony was consistent with the DOT. (Tr. 51-52, 265.) Although Verlee now objects to the VE's reliance on the DOT, Verlee's counsel declined to ask the VE *any* questions at the hearing. (Tr. 52-53); *see Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion . . . ."). *But see Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th

12

Cir. 2006) (clarifying that a claimant does not forfeit "apparent" conflicts between the VE's testimony and the DOT by failing to raise them at the hearing).

In any event, Verlee ignores that the DOT occupational title of "clergy member," like other DOT job titles, is a collection of jobs under one title. DOT 120.107-010, 1991 WL 647032 (4th ed. 1991); *see Weatherbee v. Astrue*, 649 F.3d 565, 570 n.3 (7th Cir. 2011) ("The term 'occupation,' as used by the DOT, refers to a collection of jobs . . . ."). It is not, as Verlee suggests, a composite job in which the claimant is required to perform *all* of the duties of each job across all denominations described within the description.

Moreover, "[p]ast relevant work in the regulatory scheme is a gauge by which to measure the physical and mental capabilities of an individual and the activities that he or she is able to perform, rather than a means by which to assure that the individual can actually find employment." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). Indeed:

> Notably absent from both 20 C.F.R. § [404.1560(b)] and 20 C.F.R. § [404.1520(e)] is any mention of the continued existence of past work or the ability of the claimant to obtain such work. By referring to the claimant's ability to perform a "kind" of work, § [404.1520(e)] concentrates on the claimant's capacity to perform a type of activity rather than his ability to return to specific job or to find one exactly like it.

*Id*. Succinctly stated, a finding that a claimant can perform his past relevant work is simply a finding about what the claimant *can* do, given his RFC. *See* 20 C.F.R. § 404.1560(b)(3).

Accordingly, the regulations instruct the ALJ not to consider a claimant's "vocational factors of age, education, and work experience or whether [his] past relevant work exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(b)(3). In fact, when finding that a claimant can perform his past relevant work, either as he actually performed it or as it is typically performed in the national economy, a claimant's past relevant work need not even still

exist in the national economy. *See Barnhart v. Thomas*, 540 U.S. 20, 25-30 (2003) (finding

unpersuasive claimant's contention that she was disabled because her past relevant work as an

elevator operator no longer existed in significant numbers in the national economy); *Cribbs v.*

*Astrue*, No. 1:11-cv-654, 2012 WL 4090186, at *20 (E.D. Cal. Sept. 17, 2012) (explaining that

"if a claimant is *capable of* performing his past work, he is not disabled, regardless of whether

such work exists or is available to him" (emphasis in original) (quoting *So v. Sullivan*, No. 3-88-

0970, 1989 WL 281939, at *3 (N.D. Cal. Oct. 30, 1989)).

Not to be deterred, Verlee asserts that the ALJ's step-four finding violates his, as well as

the United Methodist Church's, rights under the Free Exercise and Establishment Clauses of the

First Amendment.  More particularly, he contends that the ALJ's finding that he was capable of

performing his past relevant work has a "coercive effect" because "it sends him off to work as a

minister at a church 'in the national economy' other than the one he long served and to which he

still belongs as a member." (Pl.'s Br. 15.)  He further assets that "[n]o arm of the government

may deny government benefits on the basis that the individual would not need them if only he

would agree to change his religious faith or adopt a new church." (Pl.'s Br. 15.)  Finally, he

claims that the ALJ's decision interferes with the United Methodist Church's right to determine

who can act as its ministers, in particular, his bishop's determination that he serve in a part-time,

unpaid role rather than as a full-time minister. (Pl.'s Br. 16.)

But, to reiterate, the ALJ's step-four finding simply means that under Social Security

law, Verlee has the physical and mental capabilities necessary to perform his past relevant work

as it is typically performed in the national economy. *See* 20 C.F.R. § 404.1560(b).  This finding

does not *compel* Verlee to work as a minister in a different denomination or *compel* his bishop to

place him as a full-time pastor in a United Methodist Church; as explained earlier, when finding

that a claimant can perform his past relevant work, such work need not even still exist in the

national economy, *see Barnhart*, 540 U.S. at 25-30.  This distinguishes the instant circumstances

from the case cited by Verlee, *Hosanna-Tabor Evangelical Lutheran Church & School v.

E.E.O.C.*, 132 S. Ct. 694 (2012), in which the United States Supreme Court explicitly reaffirmed

that a church has an absolute right under the First Amendment to hire and fire ministers without

judicial intervention.  Here, whether or not Verlee is awarded disability benefits by the Social

Security Administration will not interfere with the United Methodist Church's religious

endeavors.  The Church is not a party to this suit, and thus will not be bound by a decision of the

Commissioner denying or awarding disability.

And to the extent Verlee is suggesting that the ALJ must find that he is disabled based on

the United Methodist Church's award of disability benefits, that argument too is unpersuasive.

The ALJ considered this evidence but assigned it "little weight," correctly explaining that such a

decision is not binding on the Social Security Administration because it is based on the Church's

rules and criteria, *not* Social Security law. (Tr. 28.)  Indeed, 20 C.F.R. § 404.1504 specifically

states:

> A decision by any nongovernmental agency or any other governmental agency
> about whether you are disabled or blind is based on its rules and is not our
> decision about whether you are disabled or blind.  We must make a disability or
> blindness determination based on social security law.  Therefore, a determination
> made by another agency that you are disabled or blind is not binding on us.

*See Clifford*, 227 F.3d at 874 ("[T]he ALJ is not required to (but may) consider the disability

finding of other agencies."); SSR 06-03p, 2006 WL 2329939, at *6-7.

In sum, the ALJ's step-four finding that Verlee can perform his past relevant work as it is

typically performed in the national economy is supported by substantial evidence—namely, the VE's testimony, which Verlee did not challenge at the hearing. In addition, Verlee's assertions that the ALJ's step-four finding violates his constitutional rights are unsupported. Accordingly, his first argument does not merit a remand of the Commissioner's final decision.

*D. The ALJ's Consideration of Dr. Musgrave's Opinion Is Supported by Substantial Evidence*

Next, Verlee claims that a remand is warranted because the ALJ created an "internal inconsistency" in his decision when he assigned Dr. Musgrave's opinion "great weight" but then failed to incorporate *all* of her stated limitations into the RFC. Again Verlee's argument does not necessitate a remand of the ALJ's decision.

"[A] medical source statement must not be equated with the administrative finding known as the RFC assessment." SSR 96-5p, 1996 WL 374183, at *5. Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 404.1527(d); SSR 96-5p, 1996 WL 374183, at *5. To review, the RFC is a determination of the tasks a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 404.1545.

Here, the ALJ assigned "great weight" to the opinions of Dr. Von Bargen, an examining

psychologist; Dr. Stevens, a treating endocrinologist; Dr. Sands, a state agency physician; Dr. Larsen, a state agency psychologist; and Dr. Musgrave, an examining psychologist. To review, Dr. Von Bargen in June 2009 assigned Verlee a GAF of 60 and opined that he had average memory, concentration, and attention and no symptoms of anxiety or depression. (Tr. 540.) Dr. Stevens wrote in November 2006 that Verlee could return to work because, aside from some complaints of fatigue, he no longer had confusion or other cognitive deficits. (Tr. 389.) In May 2009, Dr. Sands opined that Verlee had the physical capacity to perform light work (Tr. 483-84), and Dr. Larsen concluded that his psychological condition caused only mild difficulties in his activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 555). Similarly, Dr. Musgrave found that Verlee had average intelligence and no significant memory problems; that the test results did not support his complaints of impaired cognition due to fatigue; and that Verlee's inconsistent pattern of performance across tests raised questions of effort, indicating that most likely there was an underestimate of some of his abilities. (Tr. 378-79.)

Despite this plethora of support for the ALJ's conclusions, Verlee nibbles at the ALJ's consideration of Dr. Musgrave's opinion, contending that it provides a basis for a remand of the Commissioner's final decision. Specifically, Verlee complains that although the ALJ penned a paragraph summarizing Dr. Musgrave's fifteen-page narrative summary, he erred by failing to mention and adopt three findings by Dr. Musgrave that purportedly undercut the ALJ's decision: (1) that although Dr. Musgrave found "no significant memory problems," she did comment that his "visual memory measures" were "quite impaired"; (2) that he had to urinate frequently during the evaluation and reported two bowel accidents in the months preceding the

appointment; and (3) that although Dr. Musgrave checked nineteen of twenty mental activity categories on the mental RFC form as "no evidence of limitation," she checked the "markedly limited" box for one category—"the ability to respond appropriately to changes in the work setting." (Tr. 378-81.)

First of all, the ALJ "is not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to [his] conclusions." *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). Only "[i]f the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). In fact, the Seventh Circuit Court of Appeals counsels that "even a 'sketchy opinion' is sufficient if it assures us that an ALJ considered the important evidence and enables us to trace its reasoning." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

Here, the few straws that Verlee grasps from Dr. Musgrave's lengthy evaluation fall short of constituting an "entire line of evidence" that the ALJ ignored. *Carlson*, 999 F.2d at 181. The Court must "read the ALJ's decision as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished). Although Dr. Musgrave remarked that Verlee's "visual memory measures" were quite impaired, she at the same time found that "[t]here was no difference between his IQ scores and his memory scores indicating no significant memory problems"; reported that Verlee said he had always had "visual spatial difficulties"; and noted that he was able to self-correct his GPS system in finding the examination office. (Tr. 378-79.) Moreover, Verlee does not point to any other medical evidence in the record that illustrates how such "visual memory" deficits impair his functional

abilities; rather, the overwhelming medical evidence records only mild psychological limitations. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [his] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 416.912(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.")).

Similarly, Verlee criticizes the ALJ for failing to include a bladder and bowel limitation in his RFC based on Dr. Musgrave's remark that he urinated frequently during the evaluation; reportedly had two bowel accidents in the months preceding the evaluation; and that anxiety may exacerbate this condition. But Dr. Musgrave *also* noted that Verlee reported he had experienced "significant bowel problems on Sundays when he needed to preach the sermon" early in his career, explaining that for the first four or five years of his ministry he would have diarrhea every Sunday morning. (Tr. 369.) Moreover, Dr. Musgrave emphasized that Verlee took less than a thirty-minute break over the course of a nine-hour evaluation (Tr. 379), and Verlee does not point to other evidence in the record suggesting he is functionally limited by his bowel and bladder frequency. *See Scheck*, 357 F.3d at 702; 20 C.F.R. § 404.1512(c).

And finally, Verlee argues that although Dr. Musgrave checked nineteen of twenty mental activity categories on the mental RFC assessment form as "no evidence of limitation," she checked "markedly limited" for one category—"the ability to respond appropriately to changes in the work setting." Verlee emphasizes that this mental activity is "generally required by competitive, remunerative work" (Pl.'s Br. 20 (quoting SSR 96-8p, 1996 WL 374184, at *6)).

But on this record, this check-the-box evidence falls short of constituting an "entire line of evidence" that the ALJ ignored. As a general principle, it is not unreasonable for an ALJ to

discount a doctor's opinion where she merely checked a box but did not elaborate on the basis for the opinion. *Dixon*, 270 F.3d at 1177. Dr. Musgrave did not discuss this limitation in her narrative summary, merely summarizing that Verlee's personality testing revealed that he was somewhat "defensive, moralistic, and rigid." (Tr. 379.) And no other medical source opinion of record indicated that Verlee had significant problems responding appropriately to changes in the work setting; rather, Drs. Von Bargen and Larsen both indicated that he had just mild to moderate limitations in adaptive functioning. (Tr. 557.)

Moreover, the ALJ emphasized that Verlee was filling in for other pastors at various churches on a part-time basis and that these duties were going "quite well." (Tr. 26-27.) This evidence significantly undercuts any assertion that Verlee had "marked" limitations in adjusting to changes in work settings, as that is exactly what Verlee's part-time pastoral consultant duties required. Remanding this case on the basis of Dr. Musgrave's opinion would "sacrifice[] on the altar of perfectionism the claims of other people stuck in the queue." *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985); *see Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

In sum, although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ and is based upon his consideration of *all* relevant evidence in the record. 20 C.F.R. §§ 404.1527(e), 404.1545; SSR 96-5p, 1996 WL 374183, at *5. Here, the RFC ultimately assigned by the ALJ is amply supported by the medical

and nonmedical evidence of record, and the ALJ's consideration of Dr. Musgrave's opinion was not so selective as to constitute a reversible error.

*E. The ALJ Adequately Accounted for Verlee's Left Upper Extremity Limitations in the RFC*

Finally, Verlee claims that the ALJ failed to adequately account for his left upper extremity difficulties when assigning his RFC. Contrary to Verlee's assertion, the RFC assigned by the ALJ reflecting that Verlee "could not use his non-dominant hand for fine finger manipulation" is adequately supported by the evidence.

As explained earlier, the RFC is based upon consideration of all relevant evidence in the record, including medical evidence and relevant nonmedical evidence, such as an individual's own statement of what he is able or unable to do. SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 404.1545. In challenging the RFC assigned by the ALJ, Verlee argues that a restriction from left-hand "fine finger manipulation" is inadequate because the problem encompasses his "left arm in its entirety." (Pl.'s Br. 22.) More particularly, he argues that if he uses his left arm for anything, "it trembles visibly, preventing him from holding anything in a steady fashion." (Pl.'s Br. 22.)

But the ALJ explained in his decision that he found Verlee's subjective symptom testimony "less than fully credible," a finding that Verlee does not directly challenge on appeal. (Tr. 26). In assessing Verlee's credibility, the ALJ emphasized that the objective medical evidence, including clinical examinations, consistently reflected only minimal medical signs and findings. (Tr. 24.) An ALJ is entitled to consider the objective medical evidence, or lack thereof, as a factor in assessing credibility and "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence."

*Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009); *see Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p, 1996 WL 374186, at *6-7.

More particularly, the ALJ correctly noted that in an October 2008 medical appointment, the examining physician described a "very mild left-sided postural tremor" that Verlee said was "only bothersome when he is extremely fatigued, and given that he is right-handed, was able to compensate for . . . ." (Tr. 434.) The ALJ further observed that in May 2009 Verlee's treating physicians thought that his tremor was exacerbated by Depakote; Verlee responded that although the tremor was "somewhat disruptive to his daily life," it was not so disruptive that he was interested in changing seizure medications. (Tr. 434.) The ALJ found that these statements undercut the severity of Verlee's claim of a disabling left upper extremity tremor. *See, e.g.*, *Hill v. Astrue*, No. 1:08–cv–0740–DFH–JMS, 2009 WL 426048, at *10 (S.D. Ind. Feb. 20, 2009) (discounting a plaintiff's claim of disabling symptoms where the severity was not reflected in her statements to physicians).

In addition, when assigning this RFC, the ALJ considered that Verlee performed quite an array of daily activities, including working on his computer and volunteering part time as a pastoral consultant with various Methodist churches. (Tr. 26-27.) "Although the diminished number of hours per week indicated that [Verlee] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled." *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir.2008); *see Hastings v. Astrue*, No. 08–cv–2190, 2009 WL 2601245, at *7 (C.D. Ill. Aug. 20, 2009) ("[P]art-time work after the alleged onset date of ... disability contradicted ... testimony about the severity of [claimant's] symptoms."); *Whetzel v. Astrue*, No.

1:07–cv–210, 2009 WL 537640, at *17 (N.D. Ind. Mar. 4, 2009) (concluding that the ALJ appropriately considered part-time work in making overall credibility determination). The ALJ must consider the claimant's performance of these daily activities as a factor when assessing his credibility. *See Schmidt*, 395 F.3d at 746-47; 20 C.F.R. § 404.1529(c)(3).

Therefore, Verlee's assertion that the ALJ inadequately accounted for his left upper extremity tremor when assigning his RFC is unavailing. The Court is easily able to track the ALJ's reasoning concerning the assigned limitation, and it is supported by substantial evidence. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (finding that the ALJ satisfied his "minimal duty to articulate his reasons and make a bridge between the evidence and the outcome as to his step [four] determination").

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to the parties' counsel. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. FED. R. CIV. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE

DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for this 4th day of February, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge